# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

v.                                      CR. No. 98-223 JP

**JULIA MILLOY, DUNCAN R.
MILLOY, AND PETER ARMIJO,**

        **Defendants.**

## MEMORANDUM OPINION AND ORDER

On October 21, 1998, Defendant Duncan Milloy filed a motion for attorney's fee and other litigation expenses (Doc. No. 80); on October 23, 1998, Defendant Julia Milloy also filed a motion for attorney's fee and other litigation expenses, (Doc No. 84). In a May 19, 1999, Memorandum Opinion and Order, (Doc. No. 122), the court concluded that the Defendants were "prevailing parties" under the Hyde Amendment and that the Government's dismissal without prejudice of the charges against Defendants constituted a "final judgment" under the Hyde Amendment.[1] After thoroughly considering the pleadings and the applicable law, the court now concludes that summary judgment should be entered in favor of the Government because its indictment of Defendants Duncan Milloy and Julia Milloy was not shown to have been vexatious, frivolous, or in bad faith.

---

[1] Because the facts of this case are fully recited in the May 19, 1999, Memorandum Opinion and Order, they are repeated here only when relevant to the issue addressed in this Memorandum Opinion and Order.

**I.     DISCUSSION**

Under the Hyde Amendment, a reasonable attorney's fee and other litigation expenses[2] may be awarded to a prevailing party where "the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust."  Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997).   Having already determined that the Defendants are prevailing parties and that the dismissal without prejudice of charges against them constituted a final judgment, the remaining issue to be decided is whether the Government's position in indicting Defendants was  frivolous, vexatious, or in bad faith.[3]

**A.     The Hyde Amendment**

"To construe the Hyde Amendment and apply its terms to the instant case, the Court must determine legislative intent in accordance with the standard rules of statutory construction." *United States v. Gardner*, 23 F. Supp. 2d 1283, 1288 (N.D. Okla. 1998).

*1.     Statutory Construction*

"A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979); *see also United States v. Reyes*, 16 F. Supp. 2d 759, 760 (S.D.

---

[2] The Defendants' motions and other opinions interpreting the Hyde Amendment have referred to "attorney's fee and litigation costs," "attorneys fees and other litigation expenses," "attorney's fee," "attorney's fees and litigation expenses," and "attorney's fees and costs."  This Memorandum Opinion and Order uses the statutory language, "attorney's fee and other litigation expenses," throughout the opinion.

[3] Defendants also requested a hearing or "discovery sufficient to determine whether the government's position was vexatious," (Resp. of D.Milloy at 1), but Defendants did not identify what discovery they seek.  Although other courts have ordered discovery in Hyde Amendment cases, *see, e.g., Gardner*, 23 F. Supp. 2d at 1296-97, this court concludes that neither an evidentiary hearing nor discovery is warranted in this case.

Tex. 1998) ("As the [Hyde Amendment] is fairly recent, the Court shall examine the plain language of the statute rather than relying on case precedent."). *But c.f. Troisi*, 13 F. Supp. 2d at 596 (looking to Supreme Court case law to determine the meaning of "bad faith" under the Hyde Amendment). Therefore, an analysis of "frivolous" "vexatious" and "bad faith" begins with the dictionary definitions of these words.[4] *See Reyes*, 16 F. Supp. 2d at 761 (using Black's Law Dictionary to define "bad faith" and "vexatious" under the Hyde Amendment). Black's Law Dictionary defines "frivolous" as "[l]acking a legal basis or legal merit; not serious; not reasonably purposeful." Black's Law Dictionary 677 (Bryan A. Garner ed., 7th ed. 1999). A "vexatious proceeding" is defined as "without reasonable or probable cause or excuse; harassing; annoying." *Id*. at 1559. "Bad faith" is defined as "[d]ishonesty of belief or purpose." *Id*. at 134.

   2.   *Legislative History and Intent*

"To construe the Hyde Amendment and apply its terms to the instant case, the Court must determine legislative intent in accordance with the standard rules of statutory construction." *Gardner*, 23 F. Supp. 2d at 1288. The Hyde Amendment was patterned after the Equal Access to Justice Act, 28 U.S.C. § 2412. *See* 143 Cong. Rec. H7786-04, H7791 (comments of Representative Hyde discussing the Equal Access to Justice Act ("EAJA") and stating, "[n]ow it occurred to me, if that is good for a civil suit, why not for a criminal suit?"). The EAJA states in part, "a court shall award to a prevailing party other than the United States fees and other

---

[4] Although the Defendants defined "vexatious" as used in Supreme Court law regarding attorney's fee awards under Title VII and Tenth Circuit law concerning 28 U.S.C. § 1927, there is no material difference between these definitions of "vexatious" and the dictionary definition. *See, e.g.*, *Braley v. Campbell*, 832 F.2d 1504, 1512 (10th Cir. 1987) (defining "vexatious" conduct under 28 U.S.C. § 1927 as "conduct that, viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court."). Therefore, the outcome of an analysis using either the Defendants' proposed definitions or the dictionary definition would be the same.

3

expenses . . . incurred by that party in any civil action . . . brought by the United States . . . unless the court finds that the position of the United States was substantially justified . . . ." 28 U.S.C. § 2412(d)(1)(A).

When Representative Hyde first introduced the Hyde Amendment on September 24, 1997, the proposed amendment applied the same "substantially justified" standard for the Government's conduct as set forth in the EAJA. The proposed Hyde Amendment stated, "the court, in any criminal case . . . shall award, and the United States shall pay, to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation costs, unless the court finds that the position of the United States was substantially justified or that other circumstances make an award unjust." 143 Cong. Rec. H7786-04, H7791 (statement of Rep. Hyde).

Representative Skaggs criticized the proposed amendment because it did not require a showing that the Government's conduct was "malicious" or "abusive." *Id.* at H7792 (statement of Rep. Skaggs). The Department of Justice, which vociferously opposed the proposed amendment, succeeded in causing a change of the liberal "substantial justification" standard to the more stringent "frivolous, vexatious or in bad faith" standard that is incorporated into the final version of the Hyde Amendment. *See, e.g.,* David. W. Simon, *Fighting Back: Remedies for the Wrongfully Prosecuted?*, 71 Wis. Law. 10, 12 (September 1998) ("Fierce opposition from the Department of Justice prompted Congress to substitute the 'frivolous, vexatious or in bad faith' standard to make recovery more difficult."); Elkan Abramowitz & Peter Scher, *The Hyde Amendment: Congress Creates a Toehold For Curbing Wrongful Prosecution*, 22 Champion 23 (March 1998) ("An intense lobbying effort by DOJ in opposition to an earlier version of the bill that placed the burden of proof on the government ensured that the government would not be

opening its purse strings in any but the most exceptional cases of prosecutorial abuse.").

Another salient difference between the proposed Hyde Amendment and the final Hyde Amendment is that the proposed amendment, like the EAJA, placed the burden on the government to prove that its conduct was "substantially justified," while the final Hyde Amendment "places the burden on the *defendant* to demonstrate that a prosecution was vexatious, frivolous, or brought in bad faith." *United States v. Troisi*, 13 F. Supp. 2d 595, 596 (N.D.W.Va. 1998) (emphasis added).

### 3. *Deference to Prosecutorial Decisions*

Although Congress has sent a clear message regarding its desire to curb perceived abuses by the Department of Justice in charging individuals with criminal violations, Congress' intent in this endeavor must be balanced against the historic deference accorded prosecutorial decisions. *See, e.g., Town of Newton v. Rumery*, 480 U.S. 386, 396 (1987) ("[C]ourts normally must defer to prosecutorial decisions as to whom to prosecute."); *Reyes*, 16 F. Supp. 2d at 761 (citing *Rumery* for the proposition that the court must practice restraint when reviewing prosecutorial decisions in the context of a motion for attorney's fee and other litigation expenses under the Hyde Amendment).

### B. Case law interpreting the Hyde Amendment

Although the Hyde Amendment was enacted barely two years ago, there are a handful of published cases determining whether the government's conduct was "frivolous, vexatious, or in

bad faith."[5] *See, e.g., United States v. Holland*, 34 F. Supp. 2d 346 (E.D.Va. 1999), *opinion vacated in part upon reconsideration*, 48 F. Supp. 2d 571, 581 (E.D.Va. 1999); *United States v. Ranger Electronic Communications, Inc.,* 22 F. Supp. 2d 667 (W.D.Mich. 1998); *Reyes*, 16 F. Supp. 2d 759; *Troisi*, 13 F. Supp. 2d 595. In two of these cases, *Holland* and *Ranger Electronics*, the courts awarded attorney's fee and other litigation expenses.

In *Holland*, the FDIC investigated defendant bank officers in connection with seven bank loans. Although the FDIC and defendants reached a settlement of the civil administrative proceedings, the FDIC "requested the U.S. Attorney's office to reopen [a] criminal investigation into the defendants, which had been dormant for almost a year." *Id*. at 352-53. After being acquitted of all charges against them, defendants requested attorney's fee and other litigation expenses under the Hyde Amendment. The court stated three reasons in support of its conclusion that the government's conduct was vexatious.[6] *Id*. at 365. "First, in indicting the defendants, the Prosecution relied upon evidence which it knew the FDIC deemed insufficient to pursue civil monetary penalties and restitution from the Hollands, notwithstanding the higher burden of proof required to convict the defendants of criminal offenses." *Id*. Second, "the Prosecution obviously had insufficient evidence upon which to find or infer the specific criminal intent which is an

---

[5] Subsequent to the court's May 19, 1999, Memorandum Opinion and Order, the Tenth Circuit issued an opinion interpeting the Hyde Amendment. *See United States v. Robbins*, 179 F.3d 1268 (10th Cir. 1999) (holding that district court's denial of request for attorney's fee and other litigation expenses under the Hyde Amendment was subject to the ten day appeal period of FED. R. APP. P. 4(b) rather than the sixty day appeal period of FED. R. APP. P. 4(a)). However, that opinion does not address the issue in this case.

[6] The portion of the district court's opinion finding that the government's conduct in prosecuting the defendants was vexatious was left undisturbed in the district court's later opinion. *See Hollander*, 48 F. Supp. 2d 571, 581 (reconsidering and vacating the court's prior finding of vexatious conduct by the FDIC and assessment of damages against the FDIC).

element of each count." *Id*. Third, "the Prosecution again followed the 'in terrorem' policy of the FDIC when it obtained an indictment containing thirty-one counts," in violation of the Department of Justice's own guidelines regarding the number of counts to include in an indictment, and when it was clear that there would have been no criminal indictment had the FDIC's civil administrative proceedings regarding the defendants "been resolved satisfactorily to the FDIC." *Id*. at 367.

In *Ranger Electronic*, the foreign manufacturer of radio equipment was indicted for illegal importation of radio equipment. During a jury trial, the government's key witness unexpectedly provided evidence damaging to the government's case. *Ranger Electronic*, 22 F. Supp. 2d at 670. The government then offered plea agreements to some defendants and requested dismissal of the charges pending against defendant Ranger Electronic Communications. After the court dismissed the charges with prejudice, Ranger Electronic filed a motion for attorney's fee under the Hyde Amendment. The court determined that "the conduct of the Assistant United States Attorney assigned this matter violated his obligations to share exculpatory information under *Brady v. Maryland* and constituted 'bad faith' within the meaning of the Hyde Amendment." *Ranger Electronic*, 22 F. Supp. 2d at 676 (citation omitted). Therefore, the court granted Ranger Electronic's motion for attorney's fee. *Id*.

In *Reyes* and *Troisi*, however, the courts denied defendants' motions for attorney's fee and other litigation expenses under the Hyde Amendment on the ground that the defendants had failed to meet their burden of showing that the Government's conduct was "vexatious, frivolous, or in bad faith." *See Reyes*, 16 F. Supp. 2d 759; *Troisi*, 13 F. Supp. 2d 595. In *Reyes*, the defendant filed a motion for attorney's fee and other litigation expenses under the Hyde

Amendment after being acquitted of conspiracy and aiding and abetting federal program bribery. *Reyes*, 16 F. Supp. 2d at 760. The court concluded that the defendant, whose argument for attorney's fee and other litigation expenses rested solely upon the court's granting of his motion for acquittal, had failed to meet his burden of showing that the government's action was "vexatious, frivolous, or in bad faith." *Id*. at 761 (reviewing the evidence at trial and finding that it undermined defendant's position that the charges against him were frivolous or brought in bad faith).

In *Troisi*, the government charged the defendant, a judge, with violating the civil rights of an individual after the defendant physically abused that individual in the defendant's courtroom. *Trioisi*, 13 F. Supp. 2d at 595. A jury acquitted the defendant, who later sought his attorney's fee and other litigation expenses under the Hyde Amendment. *Id*. After reviewing the evidence, the court determined that the defendant was not entitled to his attorney's fee and other litigation expenses because, contrary to the defendant's assertions, the government had acted reasonably in prosecuting the defendant and had not ignored the dual prosecution policy of the Department of Justice. *Id*. at 597. "Moreoever, the evidence presented at trial established that the events alleged in the indictment occurred." *Id*.

### C. The Government's indictment of Defendants was not frivolous, vexatious, or done in bad faith

Defendants argue that the Government's actions were "vexatious" because the Government failed to exercise reasonable diligence in determining whether it was appropriate to charge Defendants in the original or the superseding indictment.[7] Regarding the original indictment, Defendants contend that during the three and a half years that elapsed between the date of the sixth draw requests and the indictment of Defendants, the Government should have obtained the original forms of the sixth draw requests. According to Defendants, these original forms would have definitively revealed to the Government that a HUD official--not the Defendants--had written the "97%" or "98%" figures at issue on Defendants' sixth draw requests. Therefore, Defendants argue that the Government should not have indicted Defendants at all. Defendants also assert that, at a minimum, the Government should have promptly dismissed the indictment once HUD finally located and produced, on July 24, 1998,[8] the originals of the sixth draw requests, which made it clear that Defendants had not written the 97% and 98% figures. Defendants also imply that the Government violated its *Brady* obligations by failing to initially produce the originals of the draw requests.

Defendants further claim that the Government's vexatious conduct continued when, instead of dismissing the indictment, the Government obtained a superseding indictment.

---

[7] Because the parties primarily argue that the Government's conduct was "vexatious," this opinion focuses on whether the Government's conduct was "vexatious" rather than "frivolous" or in "bad faith." The court finds, without a detailed discussion, that the Government's conduct was not "frivolous" or in "bad faith."

[8] The Government asserts that it produced the originals on July 30, 1998. (Resp. at 2.)

According to Defendants, the superseding indictment, which alleged that Defendants had misled HUD into believing construction was 97% or 98% complete by stating that some individual items of construction were 100% complete, was facially flawed because it failed to actually allege a criminal violation. Defendants also argue that the Government should have obtained the original draw request forms for the first five draw requests, which would have established that the HUD official had filled in all of the % figures on the forms using the percentage relationship between the total amount escrowed and the costs incurred to date. Because the Defendants filled out the sixth draw requests using exactly the same methodology used by the HUD official who filled out the earlier draw request forms, Defendants contend that the Government's failure to obtain the earlier forms and the Government's subsequent indictment of Defendants was vexatious.

The Government argues that the Defendants have not satisfied their burden of showing that the Government's indictment of the Defendants was vexatious, frivolous, or in bad faith. At a status conference, the Government asserted that even if it had talked with HUD officials and learned that a HUD official, not the Defendants, had written the 97% and 98% figures at issue, the grand jury still would have had probable cause to indict the Defendants. *See* February 18, 1999, Minutes of Status Conference, (Doc. No. 113). At the status conference the Government also contended that the grand jury would have indicted Defendants even if the earlier draw requests had been shown to the jurors. *Id*.

The Government further contends that the essential facts in the superseding indictment are undisputed and that the draw request forms, when viewed in their totality, expressly required Defendants to certify that they were requesting money to compensate them for construction that had already been completed. According to the Government, the draw request forms clearly

10

communicate that Defendants were to fill out the % columns that are adjacent to Column Two, "Previous Draw Totals," and to Column Three, "Request for this Draw," with figures representing the percentage of completion of the project--not the percentage relationship between the total amount escrowed and the total costs incurred. In support of its argument the Government cites to various provisions of the draw request forms and Julia Milloy's statement to an insurance company following the fire at Anson Flats.

A determination of whether the Government's conduct was vexatious, i.e., without reasonable or probable cause or excuse, or harassing or annoying, requires an examination of the evidence and the chronology of events leading up to the Government's voluntary dismissal of the superseding indictment.

        *1.*     *The HUD Forms and Julia Milloy's Statement*

The five forms that comprise the sixth draw requests are, with the exception of the information filled in by the Defendants, identical to each other. (Sixth Draw Requests, Ex. 1-5 to May 19, 1999 Memorandum Opinion and Order.) On the back of each form are instructions for filling out the forms. *Id.* In paragraph two of the section titled "During Construction," the form states in part, "[b]orrower/contractor completes column 2 'Previous Draw Totals' with *percent of completion on any of the construction items.*" *Id.* (emphasis added). In paragraph three of the same section, it states in part, "[b]orrower/contractor completes column 3 'Request for This Draw' with the **actual cost of rehabilitation**, which includes materials, labor, overhead and profit. Materials cannot be paid for until they have been acceptably installed." *Id.* (emphasis in original). Paragraph five of this section states in part, "HUD approved inspector does a site insepction and reviews column 3 and makes changes where appropriate. Under no circumstances

11

can any construction item be paid for without the work being acceptably installed (e.g., materials on site cannot be included in the draw request.)." *Id*. Above the signature line for the Fee Inspector (Defendant Armijo), it states, "I also certify that this Draw Request is for completed work and I have not accepted any work that is no [sic] properly installed in workmanlike manner." *Id*. On the front of the form above the signature lines of Julia and Duncan Milloy, it states, "I hereby certify that all information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate." *Id*.

The Rehabilitation Loan Agreement signed by the Defendants states that the "funds will be released upon completion of the proposed rehabilitation in accordance with the Work write-up and Draw Request (Form HUD 9746-A) and the issuance of an acceptable Compliance Inspection Report (Form HUD 92051)." (Rehabilitation Loan Agreement, Ex. F to Government's Resp.)

In Julia Milloy's December 6, 1995, statement to the insurance company, she represented, "[t]he money was given to us on draws based on the amount of work that was complete at certain times. They would release the money in draws." (J.Milloy Statement at p. 3, Ex. A to Government's Resp.) Although Julia Milloy claims that this statement has no evidentiary value because the insurance statement is only a summary of Julia Milloy's answers and because "in December 1995, Ms Milloy had had the notion of 'percentage of completion' pounded into her by bankers, HUD, and the FBI," (Reply at ¶ 15), these facts do not negate the existence of this statement or the Government's awareness of it.

### 2. *The Original and Superseding Indictments*

Although Defendant Duncan Milloy asserts that the original indictment "charged Mr. and Mrs. Milloy with placing false percentage figures on five HUD forms," (D.Milloy's Reply at 8), the original indictment does not actually charge this. Count I of the original indictment charged that Defendants did the following:

> knowingly and willfully made and caused to be made a false, fictitious, and fraudulent material statement and representation, in that the *defendants signed and certified* on a form entitled Draw Request, Section 203(k), HUD 9746A, that rehabilitation construction on a unit located at 816 Fifth Street, Albuquerque, New Mexico was ninety-seven percent (97%) complete when in truth and fact, as the defendants knew, the rehabilitation construction on the 816 Fifth Street unit was substantially less than ninety-seven percent (97%) complete.

*See* Count I of original indictment (emphasis added). The remaining four counts in the original indictment contain the same language, although each count concerns a different unit and Counts II, IV, and V charge that Defendants signed and certified that the unit was 98% complete.

Thus, the original indictment does *not* explicitly charge Defendants with filling in the 97% and 98% figures at issue on line thirty-six of the sixth draw requests. The original indictment actually charges Defendants with signing and certifying that rehabilitation construction was 97% or 98% complete on each unit. It is undisputed that rehabilitation construction was not 97% or 98% complete on any unit and that the Defendants signed the sixth draw requests.

The superseding indictment also contained five counts. Count I charged that Defendants:

> knowingly and willfully made and caused to be made a false, fictitious, and fraudulent material statement and representation, in that the *defendants signed and certified* on a form entitled Draw Request, Section 203(k), HUD 9746A, that rehabilitation construction listed in the column on that form entitled "Construction Item", except for items numbered 8, 10, 22 and 26 . . . . had been one hundred percent (100%) completed on a unit located at 816 Fifth Street, Albuquerque, New Mexico and that these statements and representations made by the defendants led the Department of Housing and Urban Development to conclude that the rehabilitation construction on that unit was ninety-seven percent (97%) complete.

*See* Count I of superseding indictment (emphasis added). The remaining four counts are substantially the same, although each count concerns a different unit and excepts different specific construction items from the charge i.e., the construction items that Defendants had not filled in as 100% complete.

### 3. *The Government's Conduct was Not Vexatious*

Although the Government had ample time in which to obtain and review the original draw request forms before indicting the Defendants, suggesting that the Government's investigation could have been more thorough than it was, the Government's failure to do so does not rise to the level of "vexatious" conduct. As discussed above, the original indictment does not explicitly charge the Defendants with filling in the 97% and 98% figures; it merely charges making false statements by signing and certifying that rehabilitation construction was 97% or 98% complete on each unit. The fact that Defendants did not write in the 97% or 98% figures does not mean that the Government acted without reasonable or probable cause in charging Defendants in the original indictment with signing and certifying false statements.

14

Regarding Defendants' insinuation that the Government committed a *Brady* violation, the court disagrees. Although the only relevant inquiry in determining the Government's obligation to disclose information is whether the information is exculpatory, "a defendant's independent awareness of the exculpatory evidence is critical in determining whether a *Brady* violation has occurred." *United States v. Mirabel Quintanilla*, No. 97-2332, -- F.3d -- , 1999 WL 781046, slip op. at 22 (10th Cir. Oct. 1, 1999). The Defendants had in their possession copies of the draw request forms, which they had filled out in part and signed. The Defendants should have been independently aware of the exculpatory evidence and there was no *Brady* violation.

Having reviewed the language of the sixth draw request forms, the Rehabilitation Loan Agreement, and Julia Milloy's statement to the insurance company, the court finds that the Defendants have not met their burden of showing that the Government acted without reasonable or probable cause in charging Defendants in the original indictment. There was sufficient evidence from which the Government could charge that the Defendants had "knowingly and willfully" made a "false, fictitious, and fraudulent material statement and representation" on the sixth draw request forms by signing and certifying that the units were 97% or 98% complete when the Defendants knew they were not. Although Defendants argue that the forms were ambiguous and that they merely utilized the calculation method a HUD official had used on the earlier draw request forms, it was not unreasonable for the Government to conclude that the forms unambiguously called for certification of the percentage of completion of each unit and to charge the Defendants with knowingly and willfully making a false statement in violation of 18 U.S.C. § 1001 by signing and certifying that construction on each unit was 97% or 98% complete.

Nor have the Defendants established that the Government acted without reasonable or probable cause or in a harassing or annoying manner by refusing to dismiss the original indictment and by obtaining the superseding indictment. The superseding indictment appears to have been worded to reflect the Government's realization that the Defendants had not actually filled in the 97% and 98% figures. It is undisputed that Julia Milloy filled in all of the 100% figures on the sixth draw request forms and that both Defendants signed the sixth draw request forms. Although Defendants again claim that they simply followed the methodology utilized by a HUD official, that does not absolve Defendants of the obligation of reading the forms in their entirety and correctly filling them out.

The court's conclusion that the Defendants have not met their burden of establishing that the Government's conduct was vexatious comports with Hyde Amendment case law. Because there was no *Brady* violation, this case is distinguishable from *Ranger*. This case is also distinguishable from *Holland*. There is no evidence that the Government indicted Defendants because of any federal agency's dissatisfaction with a prior civil administrative hearing, that the Government violated Department of Justice polices in indicting the Defendants, or that "the Prosecution obviously had insufficient evidence upon which to find or infer the specific criminal intent which is an element of each count." *Holland*, 34 F. Supp. 2d at 365.

This case is similar to *Reyes* where the court determined that the defendant had "provided the Court with no evidence that the Government instituted its charges against him in a 'vexatious' or 'frivolous' manner or in bad faith." *Reyes*, 16 F. Supp. 2d at 761. Like the evidence in *Troisi*, the evidence in this case establishes that the events alleged in the indictment-- that Defendants made a false statement by signing and certifying the incorrect draw request

16

forms--actually occurred.  *See Troisi*, 13 F. Supp. 2d at 597.

Defendants have not shown that the Government was harassing or annoying in indicting the Defendants or that the Government acted without reasonable or probable cause or excuse.

IT IS THEREFORE ORDERED that:

1.  Defendant Duncan Milloy's motion for attorney's fee and other litigation expenses (Doc. No. 80) is DENIED;

2.  Defendant Julia Milloy's motion for attorney's fee and other litigation expenses (Doc. No. 84) is DENIED.

_____
**UNITED STATES DISTRICT JUDGE**